IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| **MICROPAIRING TECHNOLOGIES LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | **6:21-CV-00761-ADA** |
| -v- | § | |
| | § | |
| **GENERAL MOTORS LLC,** | § | |
| *Defendant.* | § | |

## MEMORANDUM IN SUPPORT OF CLAIM CONSTRUCTION ORDER

Before the Court are the parties' claim construction briefs. Dkt. Nos. 33, 35, 36, & 37.[1] After receiving the Court's Preliminary Constructions on May 8, 2022, the parties informed the Court that the claim construction hearing scheduled for May 9, 2022 was not necessary. Having reviewed the arguments made by the parties in their claim construction briefs, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this memorandum in support of its Claim Construction Order (Dkt. No. 46). *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *see also Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## I.     BACKGROUND

Plaintiff MicroPairing Technologies LLC ("Plaintiff") alleges Defendant General Motors LLC ("Defendant") infringes U.S. Patent Nos. 7,178,049 ("the '049 Patent"), 8,006,117 ("the '117 Patent"), and 8,020,028 ("the '028 Patent") (collectively, "the Asserted Patents"). The Asserted Patents are all from the same patent family, and share the same specification. The '117 and '028 Patents are both continuations of U.S. Patent No. 7,793,136 ("the '136 Patent"), which is a

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

continuation of the '049 Patent. In addition, the Asserted Patents all incorporate the disclosures of

U.S. Patent Nos. 6,629,033 ("the '033 Patent") and 7,146,260 ("the '260 Patent") by reference.

Although the '260 Patent and the '033 Patent are not asserted in this case, the parties refer

to the specifications of the '260 Patent and the '033 Patent to support their arguments. The

specifications of the '260 Patent and the '033 Patent are different from one another, as well as

from the specifications of the Asserted Patents. Specifically, the '260 Patent and its family of

patents disclose systems and methods related to a dynamic configuration ("DC") system that runs

on the multiple processors of a multiprocessor system. The DC system includes a device manager,

configuration manager, and data manager as illustrated in Figure 2.



'260 Patent at Figure 2 (highlight added).

The '033 Patent discloses systems and methods related to a communication system for a

mobile vehicle, home, or office environment with multiple processors that each run an Open

Communication ("OC") system, as illustrated in Figure 2.



'033 Patent at Figure 2 (highlight added).

The parties dispute terms of the '117 Patent and the '028 Patent. The '117 Patent, titled

"Method for Multi-tasking Multiple Java Virtual Machines in a Secure Environment," issued on

August 23, 2011, and was filed on August 18, 2010. The Abstract of the '117 Patent states:

> The present invention allows construction of a secure, real-time operating system from a portable language such as Java that appears to be a Java virtual machine from a top perspective but provides a secure operating system from a bottom perspective. This allows portable languages, such as Java, to be used for secure embedded multiprocessor environments.

Claim 1 of the '117 Patent is an illustrative claim and recites the following elements

(disputed terms in italics):

> 1. A computer system, comprising:
> a memory;
> a real-time operating system;
> a user interface;
> one or more processors in a processing system, wherein the
>     processing system is configured to:
> operate a transceiver,
> detect a new device within communication range of the
> transceiver,

detect a protocol used by the new device,

communicate with the new device in response to the detected protocol conforming with a protocol used by the processing system;

an *application* management system configured to:

identify data parameters that include *at least one of data codes, data type and device ID associated with the new device*, `

verify the new device data parameters as *at least one of authorized or unauthorized*; and

responsive to verifying the data parameters as authorized, connect to the new device, dynamically configure an *application* to process *the data types* and launch the *application* in the distributed processing system, wherein the *application* in response to launching is configured to take over control and operation of the new device including:

initiating transfer of data from the new device to the operating system; and

initiate processing of the data received from the new device.

The '028 Patent, titled "Application Management System for Mobile Devices," issued on September 13, 2011, and was filed on August 5, 2010. The Abstract of the '028 Patent states:

An application management system identifies a mobile device for use in a vehicle, home, or place of business, each of which includes a processor and is designed to function in a multiprocessor system. The mobile device is connected and configured into the multiprocessor system when a type of data used by the mobile device conforms to a type of data used in the multiprocessor system. A stored application in the multiprocessor system is identified that employs a same data type utilized on the mobile device. The stored application is run which includes taking over control and operation of the mobile device and process data received from the mobile device. Security is used to allowed to access the multiprocessor system.

Claim 18 of the '028 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

18. A method for reconfiguring *applications* in a multiprocessor, comprising:

operating a wireless device manager in at least one processor in the *multiprocessor system*, the wireless device manager *configured to*:

a. monitor for wireless signals from a new device not currently coupled to the *multiprocessor system*, wherein the new

device runs a first software *application* that processes a first type of data; and

b. wirelessly connect the new device to the *multiprocessor system*;

operating a configuration manager in one of the multiple processors in the *multiprocessor system*, the configuration manager *configured to:*

c. monitor operations of the multiple processors in the *multiprocessor system*;

d. identify data codes in the wireless signals from the new device and use the data codes to identify the first type of data processed by the first software *application* running on the new device;

e. responsive to identifying the data codes from the new device, select a second software *application* from among multiple different software *applications* stored within memory in the *multiprocessor system*, wherein the second software *application* is associated with the first type of data processed by the new device and is not currently loaded into one of the multiple processors in the *multiprocessor system*;

f. *download a copy of the second software application selected from the memory to one of the multiple processors in the multiprocessor system*;

g. reconfigure one of the multiple processors in the *multiprocessor system* to run the second software *application* downloaded from the memory and take over control and operation of the new device; and

h. process data from the new device with the second software *application* operating in and controlled by the particular one of the multiple processors in the *multiprocessor system*; and

i. operating a *security manager configured to determine authority to access at least some of the new devices, software applications or data used in the multiprocessor system*.

Finally, patents from the family have been asserted in other cases, and four of disputed terms in this case were previously addressed in the other cases. The other cases are as follows:

- A Special Master provided an Order addressing three of the disputed terms in this case in *Eagle Harbor Holdings, LLC v. Ford Motor Co.*, No. 3:11-cv-05503-BHS (W.D. Wash. July 29, 2013) ("the *Eagle Harbor* case"). *See* Dkt. No. 33-2.

- Judge Rodriguez provided an Order addressing four of the disputed terms in this case in *MicroPairing Techs. LLC v. Toyota Motor Manufacturing Texas, Inc.*, No. 5:21-cv-00940-XR (W.D. Tex. January 5, 2022) ("the *Toyota* case"). *See* Dkt. No. 35-6.

- The Court provided preliminary constructions addressing four of the disputed terms in this case in *MicroPairing Techs. v. General Motors*, 6:20-cv-01002-ADA (W.D. Tex. February 25, 2022) ("the -1002 case"). *See* Dkt. No. 35-4. Pursuant to the parties' request, the Court consolidated the -1002 case with this case on June 27, 2022. *See* Dkt. No. 47.

## II.    LEGAL PRINCIPLES

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But,

"'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the

particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported

assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable

than the patent and its prosecution history in determining how to read claim terms." *Id*. The

Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's
> intrinsic evidence and to consult extrinsic evidence in order to understand, for
> example, the background science or the meaning of a term in the relevant art during
> the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871)
> (a patent may be "so interspersed with technical terms and terms of art that the
> testimony of scientific witnesses is indispensable to a correct understanding of its
> meaning"). In cases where those subsidiary facts are in dispute, courts will need to
> make subsidiary factual findings about that extrinsic evidence. These are the
> "evidentiary underpinnings" of claim construction that we discussed in *Markman*,
> and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B.   Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed

according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts

as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either

in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d

1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362,

1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309

(Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the

plain meaning in two instances: lexicography and disavowal."). The standards for finding

lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the
general rule, such as the statutory requirement that a means-plus-function term is construed to
cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v.
Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.       Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

## III.    CONSTRUCTION OF DISPUTED TERMS

The parties' dispute the meaning and scope of eight terms or phrases in the '117 Patent and the '028 Patent. Each dispute is addressed below.

### A.  "application"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
| --- | --- | --- |
| "application" | No construction necessary. Ordinary meaning. | "software, other than operating system and support software, that performs a task to fulfill a specific need of a user" |

### 1.  Analysis

The term "application" appears in all of the asserted claims. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "application" should be limited to "software … that performs a task to fulfill a specific need of a user," as Defendant proposes.[3] The parties also dispute whether the Court should indicate that "applications" are different from operating system and support

---

[3] The parties' arguments for this disputed term can be found in Defendant's Opening Claim Construction Brief (Dkt. No. 33 at 6-10); Plaintiff's Responsive Claim Construction Brief (Dkt. No. 35 at 7-9); Defendant's Reply Claim Construction Brief (Dkt. No. 36 at 5-6); and Plaintiff's Sur-Reply Claim Construction Brief (Dkt. No. 37 at 5-6).

software, as Defendant proposes.

The Court finds that an "application" is "software, other than operating system, that performs a task." Figure 2 of the '033 Patent illustrates the different layers of computer programs that execute on each processor in the system. The figure indicates that the applications and operating system are distinct software layers:



'033 Patent at FIG. 2 (highlight added). Accordingly, the Court construes "application" to mean "software, other than operating system."

The Court does not adopt Defendant's proposal requiring an "application" to be other than "support software," because it is inconsistent with the specification of the Asserted Patents. Specifically, the specification discloses a "sensor fusion Java application" that monitors different sensors and provides data that is used by a brake control application to control vehicle braking. *See, e.g.*, '117 Patent at 2:56–3:10. Thus, the specification provides an example of an application that "supports" other applications. Moreover, in the context of the intrinsic evidence, the term

"support software" is ambiguous, would be confusing to the jury, and should not be read into the claims.

Defendant argues that its construction is supported by a number of dictionary definitions. However, none of the cited definitions include the language "support software." Instead, Defendant's extrinsic evidence distinguishes between "operating systems" and "applications."

> [2] For example, Hargrave's Communications Dictionary contrasts an application with "an *operating system* that provides an interface between the hardware and *applications* or a *utility* that supports computer functionality and maintenance." Gray Decl. Ex. B.  As another example, the Microsoft Press Computer Dictionary explains that "[a]n application thus differs from an operating system (which runs a computer), a utility (which performs maintenance or general-purpose chores), and a language (with which computer programs are created)."  Gray Decl. Ex. C. Similarly, The Hutchinson Dictionary of Computing Multimedia and the Internet explains that "[t]he term [application] is used to distinguish [] programs from those that control the computer (systems programs) or assist the programmer, such as a compiler."  Gray Decl. Ex. D.

Dkt. No. 33 at 8 n.2. Accordingly, the Court does not adopt the "support software" language proposed by Defendant, but agrees that an "application" should be distinguished from an "operating system."

Defendant argues that its construction is identical to the court's construction in the *Eagle Harbor* case and the *Toyota* case. Defendant further contends that Plaintiff argued in the -1002 Case that "[i]f the Court is inclined to define the term, it should adopt the construction for 'application' from *Eagle Harbor*—'software, other than operating system and support software, that performs a task to fulfill a specific need of a user.'" -1002 Case, Dkt. No. 35 at 1. Defendant also contends that Plaintiff further argued in the -1002 Case that this prior construction is "consistent with the plain meaning of 'application.'" *Id.* Defendant argues that the Court should construe this term consistent with the constructions in both the *Eagle Harbor* and *Toyota* cases.

Regarding the dispute whether the term "application" should be limited to "software … that performs a task to fulfill a specific need of a user," the Court rejects Defendant's construction

because it is inconsistent with the ordinary meaning of "application." Plaintiff correctly argues that the dictionary definitions cited by Defendant do not define an application as software that performs a task "to fulfill a specific need of a user."

> [3] For example, the Hutchinson Dictionary of Computing Multimedia and the Internet explains that an application is "designed for the benefit of the end user." Gray Decl. Ex. D; *see also* Gray Decl. Ex. E (defining "application, applications program" as a "designation for computer software programs, especially high-level ones intended for end-users"). Similarly, the Microsoft Press Computer Dictionary defines an application as "[a] computer program designed to help people perform a certain type of work." Gray Decl. Ex. C; *see also* Gray Decl. Ex. B (defining "application" as "[a] computer program that is intended to perform a service or function beneficial to a user").

Dkt. No. 33 at 10 n.3. The Court agrees with Plaintiff that although applications typically perform a task, they are not necessarily tasks "to fulfill a specific need of a user."

Plaintiff further argues that Defendant's construction is also inconsistent with the specification. Plaintiff contends that the specification discloses braking control and sensor monitoring applications that may perform tasks for some reason other than "to fulfill a specific need of a user." Similarly, as discussed above, the specification discloses a sensor fusion Java application that monitors and collects sensor data, for example, data from infrared or radar sensors. *See, e.g.*, '117 Patent at 2:56–3:10. The specification discloses that a separate brake control application uses data collected by the sensor fusion application to control vehicle braking. Thus, the specification describes applications that do not "fulfill a specific need of a user." However, Plaintiff concedes that the disclosed sensor fusion application performs particular tasks, but argues that the tasks do not "fulfill a specific need of a user." Defendant did not respond to these points.

In summary, the Court generally agrees with Plaintiff, but notes that Plaintiff argued that the traditional definition for application is "a computer program that performs a specific task." Dkt. No. 37 at 5. Accordingly, the Court construes "application" to mean "software, other than operating system, that performs a task."

### 2. Court's Construction

For the reasons set forth above, the Court construes the term **"application"** to mean **"software, other than operating system, that performs a task"**

### B. "multiprocessor system" / "multi-processor system"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "multiprocessor system" / "multi-processor system" | No construction necessary. Ordinary meaning. | "system of multiple processors in which the processing tasks for applications can be coordinated across multiple processors" |

### 1. Analysis

The terms "multiprocessor system" or "multi-processor system" appear in all of the asserted claims of the '028 Patent. The Court finds that the terms are used consistently in the claims and are intended to have the same general meaning in each claim. The parties dispute whether the claimed system must include "multiple processors in which the processing tasks for applications can be coordinated across multiple processors," as Defendant proposes. [4]

The Court finds that the terms do not require construction. The intrinsic evidence indicates that the term "multiprocessor system" broadly refers to a system that includes a plurality of processors. There is nothing in the intrinsic evidence that requires limiting the "multiprocessor system" to systems in which processing tasks for applications "can be coordinated" across multiple processors. For example, Claim 18 of the '028 Patent recites "operating a configuration manager in one of the multiple processors in the multiprocessor system." Claim 18 further recites that "the second software application ... is not currently loaded into one of the multiple processors in the

---

[4] The parties' arguments for this disputed term can be found in Defendant's Opening Claim Construction Brief (Dkt. No. 33 at 10-11); Plaintiff's Responsive Claim Construction Brief (Dkt. No. 35 at 10-13); Defendant's Reply Claim Construction Brief (Dkt. No. 36 at 6-7); and Plaintiff's Sur-Reply Claim Construction Brief (Dkt. No. 37 at 6-7).

multiprocessor system," and that "a copy of the second software application selected from the memory [is downloaded] to one of the multiple processors in the multiprocessor system." Claim 18 next recites that one of the multiple processors in the multiprocessor system is reconfigured "to run the second software application downloaded from the memory and take over control and operation of the new device," and that data is processed "from the new device with the second software application operating in and controlled by the particular one of the multiple processors in the multiprocessor system." As indicated, the claim language itself provides the limitations on the "multiprocessor system," and does not indicate that the term requires coordinating processing tasks for applications across multiple processors. Indeed, the claim language repeatedly refers to "one" of the multiple processors in the multiprocessor system.

Similarly, Claim 29 of the '049 Patent recites "identifying vehicle applications running on different processors in the multiprocessor system," "operating a configuration manager that notifies the task manager upon detecting a failure running one of the identified vehicle applications in the multiprocessor system," "using the task manager for automatically identifying another processor for running the identified vehicle application …," and "initiating the identified application in the identified other processors." '049 Patent at Claim 29. This indicates that in the claimed multiprocessor system, applications are run on a single processor (*i.e.*, that their tasks are not necessarily required to coordinate across multiple processors).

Similarly, the '260 Patent, which is incorporated by reference into the Asserted Patents, states that "[a] multiprocessor system used in a car, home, or office environment includes multiple processors that run different real-time applications." '260 Patent at 1:57–59. Specifically, the specification provides the following embodiment illustrating multiple processors:

> FIG. 1 shows a car 12 that includes a car multiprocessor system 8
> having multiple processors 14, 16, 18 and 20. An engine monitor

processor 14 monitors data from different sensors 22 and 24 in the car engine. The sensors 22 and 24 can be any sensing device such as sensors that monitor water temperature, oil temperature, fuel consumption, car speed, etc. A brake control processor 20 monitors and controls an Automatic Braking System (ABS) 28. A display processor 16 is used to control and monitor a graphical user interface 26. A security processor 18 monitors and controls latches and sensors 30 and 32 that are used in a car security system.

The processors 14, 16, 18 and 20 all include software that run a Dynamic Configuration (DC) system 10 that enables new processors or devices to be automatically added and removed from the car multiprocessor system 8. The DC system 10 also automatically reconfigures the applications running on different processors according to application failures and other system processing requirements.



FIG.1

*Id.* at 2:20–37, Figure 1 (highlight added). The specification states that the processors "all include software that run a Dynamic Configuration (DC) system [] that enables new processors or devices to be automatically added and removed from the car multiprocessor system." *Id.* The "DC system [] also automatically reconfigures the applications running on different processors according to application failures and other system processing requirements." *Id.* For example, if the processor running a brake control application fails, "the DC system [] can automatically download the

braking application to another processor in [the] car." *Id.* at 2:38–52.

Similarly, Figure 2 of the '049 Patent is described as "a diagram of a multiprocessor system that runs multiple Java Virtual Machines that each include a SRE," the disclosed system "includes multiple processors 16, 18, 20, 22 and 24," and "[e]ach processor includes one or more JVMs 10 that run different Java applications." '049 Patent at 2:10–11, 2:45–47. Although the system may coordinate processing tasks for applications across multiple processors, the intrinsic evidence does not require it. Accordingly, the intrinsic evidence indicates that "multiprocessor system" broadly refers to a system that includes a plurality of processors.

Defendant argues that the claimed "multiprocessor system" should be limited to systems of multiple processors "in which the processing tasks for applications can be coordinated across multiple processors." However, Defendant did not point to any portions in the specifications or file histories for the Asserted Patents or related patents that provides a special definition for "multiprocessor system," or disavows the full scope of the term. Defendant argues that the patents state that multiple processors are networked together to facilitate coordination of processing tasks for an application across multiple processors. Dkt. No. 33 at 10-11 (citing '049 Patent at 3:47–52 ("A configuration manager 60 monitors the operation of the different processors in the system and reassigns or reconfigures Java applications and Java threads to different processors according to what processors have failed or what new processors and applications have been configured into system 15."); '260 Patent, 2:38–41 ("For example, the processor 20 may currently be running a high priority brake control application. If the processor 20 fails, the DC system 10 can automatically download the braking application to another processor in car 12.")).

Defendant further contends that Figure 5 of the '260 Patent shows a processor A that stores information that processor B is running application #2, processor C has no running applications,

processor D is running application #4 and Processor E is running "NewApp." Dkt. No. 33 at 11 (citing '260 Patent, 4:32–5:12, FIG. 5). According to Defendant, the multiprocessor system needs to have information about which applications are running on the other processors, and what their operating status is to coordinate tasks across processors.

Defendant does not dispute that asserted claims and the specifications for the Asserted Patents describe multiprocessor systems in which applications are run on a single processor (*i.e.*, that their tasks are not coordinated across multiple processors). Accordingly, Defendant's approach to claim construction is improper, because terms are not narrowed arbitrarily, rather they are afforded their full scope. This is particularly true where the proposed construction excludes a preferred embodiment. *Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1326 (Fed. Cir. 2013) (A "claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct."). The intrinsic evidence indicates that the Asserted Patents do not limit a "multiprocessor system" to systems where processing tasks for applications "can be coordinated" across multiple processors. Accordingly, the Court rejects Defendant's construction, and gives the term its plain and ordinary meaning.

### 2.  Court's Construction

For the reasons set forth above, the terms **"multiprocessor system"** and **"multi-processor system"** are given their **plain and ordinary meaning.**

### C.  "download a copy of the second software application selected from the memory to one of the multiple processors in the multiprocessor system"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "download a copy of the second software application selected from the memory to one of the multiple processors in the multiprocessor system" | "make a copy of the second software application selected from the memory available for execution by one of the multiple processors in the multiprocessor system" | "make a copy of the second software application selected from the memory available in an address space for execution by a processor in the multiprocessor system"" |

### 1. Analysis

The phrase "download a copy of the second software application selected from the memory to one of the multiple processors in the multiprocessor system" appears in Claim 18 of the '028 Patent. As the court determined in the *Eagle Harbor* case, the parties agree that this limitation requires that an application not already running on the processor must be made available for execution by the processor. The parties dispute whether "downloading" an application "from memory" "to a processor" necessarily involves making that application available "in an address space" so that it can be processed. [5]

The parties' dispute centers around what happens when the application is downloaded or moved "from memory." The specification uses the term "loading" synonymously with "download." *See, e.g.*, '028 Patent at 2:66–67 ("other Java applications that are allowed to be loaded into processor"); 3:5–7 ("noncritical operations, such as security control application 28, are allowed to be loaded onto processor 16"); Claim 18 ("the second software application … is not currently loaded into one of the multiple processors … download a copy of the second software application selected from the memory to one of the multiple processors").

In addition, Claim 18 of the '028 Patent indicates the purpose of downloading the

---

[5] The parties' arguments for this disputed term can be found in Defendant's Opening Claim Construction Brief (Dkt. No. 33 at 16-18); Plaintiff's Responsive Claim Construction Brief (Dkt. No. 35 at 18-19); Defendant's Reply Claim Construction Brief (Dkt. No. 36 at 10-12); and Plaintiff's Sur-Reply Claim Construction Brief (Dkt. No. 37 at 10).

application into the processor is to run or execute the application. '028 Patent at Claim 18 ("download a copy of the second software application selected from the memory . . . to run the second software application downloaded from the memory"); *see also*, '260 Patent at 7:25–30 ("[D]ata 130 is downloaded from memory 128 along with the navigation application 110 into processor B. The navigation icon 120 in GUI 118 then shows the navigation application 110 running on processor B"). Thus, the intrinsic evidence indicates that downloading the applications "from memory," and into the processor (or for processing) requires that the application be loaded "into" or "onto" the processor for execution.

The intrinsic evidence further indicates that the processors disclosed in the '028 Patent are connected to memory. *See, e.g.*, '260 Patent at 4:40-41 ("Processor A includes a memory 65 that stores the other recognized processors B, C and D"). Defendant argues that the processor must first create an address space in its working memory for the application in order to load the application for execution. Relying on extrinsic evidence, Defendant contends that "multiple technical references confirm that executing or running an application involves allocating space for the application in the processor's memory." Dkt. No. 33 at 18. Defendant submits that "[t]he creation of an address space in a processor's memory, into which the application is loaded, is necessary before the processor runs the application." *Id.* Defendant provides the following extrinsic evidence to support its construction:

memory[§] for the application.  This cannot be reasonably disputed.  Indeed, multiple technical references confirm that executing or running an application involves allocating space for the application in the processor's memory. *See, e.g.*, Gray Decl. Ex. I ("A.4. ***Loading. … To start a program the operating system performs the following steps:*** 1. Reads the executable file's header to determine the size of the text and data segments. 2. ***Creates a new address space for the program***."); Ex. J ("On most modern systems, each program is ***loaded into a fresh address space***, which means that all programs are loaded at a known fixed address and can be linked for that address. In that case, ***loading is pretty simple and requires the following steps:*** 1. Read enough header information from the object file to find out how much address space is needed. 2. ***Allocate that address space, in separate segments if the object format has separate segments.*** …").  The creation of an address space in a processor's memory, into which the application is loaded, is necessary before the processor runs the application.

*Id.*

Plaintiff correctly responds that Defendant's proposed language of "in an address space" is not found in the intrinsic record. However, Plaintiff does not argue that it is incorrect, but instead argues that "if" it is correct, "there is no need to risk confusing the jury by introducing the technically complex language 'in an address space' into the claims because the language would not help resolve issues of infringement or validity." Dkt. No. 35 at 19. According to Plaintiff, "[if] an application is necessarily made available in an address space before being executed by a processor, injecting the language 'available in an address space' will not help resolve issues of infringement or validity because the language would be inherently satisfied by any processor executing an application." *Id.*

Defendant replies that its proposed language acts to clarify the meaning of "download." Dkt. No. 36 at 11. Defendant argues that without it, Plaintiff could incorrectly argue that the second

step of loading individual instructions from the application into the processor's registers, could correspond to "mak[ing] the [] software application from the memory available for execution by the particular one of the on-board processors," rather than the download step specifically identified in the asserted claims, and captured by its proposed language of "in an address space." *Id.*

Plaintiff replies that its construction expressly includes an application coming "from memory." According to Plaintiff, the language "in an address space" is redundant, because software is necessarily moved to an address space in working memory before it is executed by a processor. Plaintiff contends that there is no need to risk confusing the jury by introducing complex technical language like "in an address space" into the claims, because the language does not impact issues of infringement or validity.

The Court generally agrees with Plaintiff that it is less than ideal, and potentially problematic, to read language into the claims that is only found in the extrinsic evidence. However, in this instance, Plaintiff failed to provide a persuasive argument that the language is inaccurate or incorrect. Moreover, Defendant raised a dispute regarding the scope of the claims, and its proposal appears to resolve the dispute. Accordingly, the Court adopts Defendant's construction.

### 2.  Court's Construction

For the reasons set forth above, the Court construes the phrase  **"download a copy of the second software application selected from the memory to one of the multiple processors in the multiprocessor system"** to mean **"make a copy of the second software application selected from the memory available in an address space for execution by a processor in the multiprocessor system"**

> ### D.  "security manager configured to determine authority to access at least some of the new devices, software applications or data used in the multiprocessor system"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "security manager configured to determine authority to access at least some of the new devices, software applications or data used in the multiprocessor system" | No construction necessary. Ordinary meaning. | Indefinite. |

### 1. Analysis

The phrase "security manager configured to determine authority to access at least some of the new devices, software applications or data used in the multiprocessor system" appears in Claim 18 of the '028 Patent. The parties dispute whether the term "the new devices" recited in this phrase lacks antecedent basis, and therefore renders Claim 18 indefinite. [6]

Claim 18 of the '028 Patent recites "monitor for wireless signals from a new device not currently coupled to the multiprocessor system, where in the new device runs a first software application that processes a first type of data." Claim 18 then subsequently refers to "the new device" eight more times in the claim. However, the final limitation of Claim 18 recites "operating a security manager configured to determine authority to access at least some of the new devices, software applications or data used in the multiprocessor system." Defendant argues that all of the other portions of Claim 18 only recite "the new device" (singular). According to Defendant, the change from "the new device" (singular) to "the new devices" (plural) renders Claim 18 indefinite, because it is not clear which device or devices the plural term "the new devices" refers.

Plaintiff argues that it is well-settled that the use of "a" or "an" carries the meaning "one or more." Dkt. No. 35 at 20 (citing *SanDisk Corp. v. Kingston Tech. Co.*, 695 F.3d 1348, 1360

---

[6] The parties' arguments for this disputed term can be found in Defendant's Opening Claim Construction Brief (Dkt. No. 33 at 19-20); Plaintiff's Responsive Claim Construction Brief (Dkt. No. 35 at 19-21); Defendant's Reply Claim Construction Brief (Dkt. No. 36 at 12-13); and Plaintiff's Sur-Reply Claim Construction Brief (Dkt. No. 37 at 10-11).

(Fed. Cir. 2012) ("[T]his court has repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more'.") (internal citation omitted)). Plaintiff contends that the claimed wireless device manager is configured to monitor for signals from "a new device," thus, Claim 18 refers to a wireless device manager configured to monitor for signals from one or more new devices. Plaintiff further argues that the claim's recitation of a security manager configured to determine authority to access "at least some of the new devices" is consistent with traditional interpretation of "a" as "one or more."

The Court agrees that the phrase "at least some" indicates that one or more new devices can satisfy the claim. Contrary to Defendant's contention, the claim language "at least some of the new devices" refers to the previously claimed "a new device," which means one or more new devices. The Court agrees with Plaintiff that while a single device constitutes at least some of the one or more devices, it would be poor grammar to have claimed "at least some of the new device."

Defendant relies on *Imperium (IP) Holdings v. Apple Inc.*, 920 F. Supp. 2d 747 (E.D. Tex. 2012), for the proposition that referring to a term with both singular and plural forms renders the claim indefinite. Defendant's reliance on *Imperium* is misplaced. The claim language at issue here does not create ambiguity like the claim language at issue in *Imperium*. In *Imperium*, the claims allowed for multiple sources of red pixels. Specifically, the claim recited "groups of pixels, wherein each of said groups of pixels include[] a red pixel having an output" and "a first analog-to-digital converter connected to the output of the red pixel for converting the output of the red pixels … ." *Imperium*, 920 F. Supp. 2d at 756. The mixed use of "red pixel" and "red pixels" created an ambiguity as to "whether the outputs of multiple pixels are converted into one digital signal per pixel or are instead combined into one digital signal for all pixels." *Id.* at 757.

Here, there is no such ambiguity. Unlike the claim at issue in *Imperium*, the only new

devices in Claim 18 are the one or more devices to which the wireless device manager is configured to connect. In other words, the phrase "at least some of the new devices" is understood when viewed in the context of the specification and the claim language as a whole. In summary, the test for indefiniteness is whether one of skill in the art would understand "the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910. Defendant failed to show that a person of ordinary skill in the art would not understand the scope of Claim 18 of the '028 Patent with reasonable certainty. Accordingly, the Court finds that Defendant failed to meet its burden of showing by clear and convincing evidence that Claim 18 is indefinite.

### 2. Court's Construction

The Court finds that the phrase **"security manager configured to determine authority to access at least some of the new devices, software applications or data used in the multiprocessor system"** is not indefinite, and no construction is required.

### E. Claim 18 of U.S. Patent No. 8,020,028

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| Claim 18 of U.S. Patent No. 8,020,028 | No construction necessary. Ordinary meaning. | Indefinite. |

### 1. Analysis

The parties dispute whether a Claim 18 of the '028 Patent impermissibly mixes statutory subject matter classes, and therefore is indefinite under 35 U.S.C. § 112. [7] The Court finds that the claim does not improperly mix statutory subject matter classes. Defendant argues that Claim 18 of the '028 Patent purports to be a method claim but only recites vague "operating" steps. Defendant

---

[7] The parties' arguments for this disputed term can be found in Defendant's Opening Claim Construction Brief (Dkt. No. 33 at 20-21); Plaintiff's Responsive Claim Construction Brief (Dkt. No. 35 at 21-23); Defendant's Reply Claim Construction Brief (Dkt. No. 36 at 13-14); and Plaintiff's Sur-Reply Claim Construction Brief (Dkt. No. 37 at 11-13).

contends that the claim recites certain components along with functional descriptions of the capabilities of those components. The problem, Defendant argues, is that the claimed methods are not limited to operating those components according to any of their described capabilities, nor do the described components add any meaning to the claimed method. According to Defendant, the claims are entirely unconstrained and are written so broadly that they conceivably encompass every possible "operating," and do not provide any clarity as to when the claim would be infringed.

Defendant further submits that it is unclear if this claim would be infringed when the vehicle is first turned on and the audio system begins playing music from the radio, or when the driver presses the "mute" button, or when the driver changes the volume. Defendant argues that it is not clear whether a manufacturer and/or installer of the systems described in the "method" claim could be found guilty of infringement simply by manufacturing/installing the systems, because any possible "operating" could conceivably infringe this claim. The Court disagrees with Defendant's analysis, and finds that Claim 18 is not indefinite.

A person of skill in the art at the time of the invention would have understood from the claim language that the claim is infringed upon performing the act of "operating a wireless device manager" with the claimed structural requirements, "operating a configuration manager" with the required structural requirements, and "operating a security manager" with the claimed structural requirements. Defendant argues that the term "operate" is unclear. The Court disagrees. Operate is a commonly used word that means "to cause to function." *See, e.g.*, Dkt. No. 37-2 at 5. Accordingly, a person of ordinary skill in the art would understand that the claim is infringed when the claimed wireless device manager, configuration manager, and security manager are operated.

Moreover, the claim at issue here can be distinguished from those at issue in *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005), and related cases

"because the method claim ... [does] not create any confusion as to when the claim [is] directly infringed; direct infringement occur[s] upon practicing the claimed method in [a multiprocessor system] with the required structural limitations." *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1318 (Fed. Cir. 2011). Indeed, Plaintiff concedes that "[s]imply making or selling a system having the structures set forth by claim 18 would not infringe," because "Claim 18 unambiguously recites 'operating a wireless device manager' configured with certain features, 'operating a configuration manager' configured in a particular way, and 'operating a security manager' with particular features." Dkt. No. 35 at 23. Accordingly, the Court finds that Defendant failed to meet its burden of showing by clear and convincing evidence that Claim 18 is indefinite.

### 2.  Court's Construction

The Court finds that Claim 18 of U.S. Patent No. 8,020,028 is not indefinite, and no construction is required.

### F.  "at least one of data codes, data type and device ID"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
| --- | --- | --- |
| "at least one of data codes, data type and device ID" | No construction necessary. Ordinary meaning. | The term "at least one of ... and ..." is conjunctive. |

### 1.  Analysis

The phrase "at least one of data codes, data type and device ID" appears in Claim 1 of the '117 Patent. The parties dispute whether the phrase "at least one of [A], [B], and [C]" is disjunctive or conjunctive. [8] The Court finds that the phrase "at least one of [A], [B], and [C]" is conjunctive, as used in the claims of the '117 Patent. Specifically, the claims indicate that the patentee

---

[8] The parties' arguments for this disputed term can be found in Defendant's Opening Claim Construction Brief (Dkt. No. 33 at 22-24); Plaintiff's Responsive Claim Construction Brief (Dkt. No. 35 at 23-26); Defendant's Reply Claim Construction Brief (Dkt. No. 36 at 15-16); and Plaintiff's Sur-Reply Claim Construction Brief (Dkt. No. 37 at 13-15).

understood how to draft clams using the disjunctive phrase "at least one of [A], [B], or [C]." Specifically, Claims 4, 9, and 10 of the '117 Patent utilize the phrase "at least one of … or …"

> 4. The application management system of claim 1 wherein the user interface comprises *at least one of*: an information display, a touch screen, a user operated switch, a voice responsive input, a haptic feedback, *or* an audio output.

> 9. The application management system of claim 1 wherein the detected new device includes a data storage device comprising *at least one of* a hard disk drive, solid state device, *or* compact disk.

> 10. The application management system of claim 9 wherein the processor is coupled to a readable and writeable data storage comprising *at least one of* a solid state device, hard disk drive, *or* compact disk.

'117 Patent at Claims 4, 9, and 10 (emphasis added). Similarly, Claim 1 of the '117 Patent recites "verify the new device data parameters as *at least one of* authorized *or* unauthorized." (emphasis added). Thus, the claims of the '117 Patent indicate that the patentee knew how to claim a disjunctive meaning, but ultimately decided to use the term "at least one of … and …" elsewhere in the claims of the '117 Patent. Thus, it is hard to explain why the terms "and" and "or" should both have a disjunctive meaning in the '117 Patent.

The patentee had multiple options available to use disjunctive language if that was intended, as recognized by the PTAB, including: "(1) at least one of A *or* B; (2) at least one of A *or at least one of* B; or (3) at least one *selected from the group* of A and B." *Ex parte Jung*, Appeal No. 2016-008290, 2017 WL 1130560, at *7 (P.T.A.B. Mar. 20, 2017) (emphases in original). Indeed, the patentee explicitly selected one of these options in the dependent claims. Plaintiff would like to rewrite this term to mean "or" instead of "and," but that is not the Court's role. *See Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (refusing to replace the claim limitation, "to," with a different word, "at," explaining that "we construe the claim as written, not as the patentees wish they had written it").

Plaintiff does not address the challenge presented by Claims 4, 9, and 10 of the '117 Patent, but instead argues that Defendant has not overcome the presumption that the same claim term should be construed consistently in related patents. Plaintiff contends that the Court should construe the phrase "at least one of … and …" as disjunctive as it did with respect to the use of the phrase in the related '015, '292, and '383 Patents. The Court recognizes that in an ideal situation, the constructions would be consistent across the patent family. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume … that the same claim term in the same patent or related patents carries the same construed meaning.") (internal citation omitted). However, the claims of the '117 Patent indicate a different result from the previous constructions. The Federal Circuit has also held that the term "and" should be given its plain and ordinary meaning (*i.e.*, "and" not "or") unless "the specification compels a disjunctive construction," for example, when the term "conjoins mutually exclusive possibilities." *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949-50 (Fed. Cir. 2016).

### 2. Court's Construction

For the reasons set forth above, the term **"at least one of … and …"** is conjunctive except where it is strictly used disjunctively to describe a list of only a binary choice of two options.

### G. "the data types"

| Disputed Term | Plaintiff's Proposal | Defendant's Proposal |
|---|---|---|
| "the data types" | No construction necessary. Ordinary meaning. | Indefinite. |

### 1. Analysis

The term "the data types" appears in Claim 1 of the '117 Patent. The parties dispute whether the term "the data types" lacks antecedent basis, and therefore renders Claim 1 indefinite.[9]

---

[9] The parties' arguments for this disputed term can be found in Defendant's Opening Claim

Claim 1 of the '117 Patent recites "identify data parameters that include at least one of data codes, ***data type*** and device ID associated with the new device." '117 Patent at Claim 1 (emphasis added). Claim 1 further recites "dynamically configure an application to process the ***data types***." *Id.* (emphasis added).

Defendant argues that the term "the data types" renders Claim 1 indefinite because it lacks antecedent basis. Defendant contends that the change from "data type" (singular) to "the data types" (plural) renders Claim 1 indefinite, because it is not clear to which data type or types the plural term "the data types" refers. Defendant further argues that the court in *Imperium (IP) Holdings, Inc. v. Apple, Inc.*, found claims indefinite that recited "***a red pixel*** having an output" and "a first analog-to-digital converter … for converting the output of ***the red pixels***," because the "sudden change" from the term "a red pixel" (singular) to the term "the red pixels" (plural) resulted in an antecedent basis problem rendering the claims indefinite. *Imperium*, 920 F. Supp. 2d at 753 (emphasis added).

The Court finds that the term "the data types" does not render the claim indefinite. Even where a claim term lacks antecedent basis, the party challenging the claim must prove by clear and convincing evidence that the claim, interpreted in light of the specification and the prosecution, history fails to "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 572 U.S. at 910. Claim 1 recites, in part, "an application management system configured to" "identify data parameters that include ***at least one of*** … ***data type***" and "configure an application to process ***the data types***." '117 Patent at Claim 1 (emphases added).

The term data type is only used twice in the claim. Thus, there is only one thing "the data

---

Construction Brief (Dkt. No. 33 at 24-25); Plaintiff's Responsive Claim Construction Brief (Dkt. No. 35 at 26-27); Defendant's Reply Claim Construction Brief (Dkt. No. 36 at 16-17); and Plaintiff's Sur-Reply Claim Construction Brief (Dkt. No. 37 at 15-17).

types" refers to, which is the previously identified "at least one of ... data type." Unlike the claims in *Imperium*, where "the red pixels" could refer to pixels from two different sources, there is no intrinsic ambiguity in the present claim. Defendant did not provide any evidence that Claim 1 or the term "the data types" fails to inform those skilled in the art about the scope of the invention with reasonable certainty. A party challenging the validity of a claim bears the burden of proving invalidity by clear and convincing evidence. Defendant failed to meet its burden, and the Court finds that Claim 1 of the '117 Patent is not indefinite.

### 2.  Court's Construction

The Court finds that the term **"the data types"** is not indefinite, and no construction is required.

### IV.   CONCLUSION

The Court adopts the constructions listed in the Claim Construction Order (Dkt. No. 46) for the reason set forth in this memorandum. Furthermore, the Parties should ensure that all testimony that relates to the terms addressed in this memorandum is constrained by the Court's reasoning. However, in the presence of the jury the Parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this memorandum that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

Dated: July 5, 2022

_____
DEREK T. GILLILAND
UNITED STATES MAGISTRATE JUDGE